# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP643 |
| COMPLETE TITLE: | North Highland Inc., |
| | Plaintiff-Appellant-Petitioner, |
| | v. |
| | Jefferson Machine & Tool Inc. and Steven M. Homann, |
| | Defendants, |
| | Frederick A. Wells, |
| | Defendant-Respondent. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 369 Wis. 2d 223, 880 N.W.2d 182
(2016 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 6, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 17, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Jefferson |
| JUDGE: | William F. Hue |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | ROGGENSACK, C.J. dissents (opinion filed). |
| | R.G. BRADLEY J. dissents, joined by KELLY, J. (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-appellant-petitioner, there was a brief by *Kyle B. Hanson* and *Hanson Law Group*, *LLP*, Barrington, and oral argument by *Kyle B. Hanson*.

For the defendant-respondent, there was a brief by *Bruce A. Schultz*, *Vincent J. Scipior*, and *Coyne*, *Schultz*, *Becker & Bauer*, *S.C.*, Madison, and oral argument by *Bruce A. Schultz*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2015AP643
(L.C. No. 2012CV125)

STATE OF WISCONSIN       :      IN SUPREME COURT

**North Highland Inc.,**

      **Plaintiff-Appellant-Petitioner,**

  **v.**

**Jefferson Machine & Tool Inc. and Steven M. Homann,**

      **Defendants,**

**Frederick A. Wells,**

      **Defendant-Respondent.**

**FILED**

**JUL 6, 2017**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 ANN WALSH BRADLEY, J. Petitioner, North Highland, Inc., seeks review of an unpublished per curiam opinion of the court of appeals affirming a circuit court grant of summary judgment in favor of Frederick A. Wells ("Wells").[1] The court of

---

[1] N. Highland Inc. v. Jefferson Mach. & Tool Inc., No. 2015AP643, unpublished slip op. (Wis. Ct. App. Apr. 28, 2016) (affirming judgment and order entered by the circuit court for Jefferson County, William F. Hue, J., presiding).

(continued)

appeals determined that the circuit court properly entered summary judgment in favor of Wells. It concluded that North Highland failed to present evidence sufficient to support either its claim of conspiracy to breach a fiduciary duty or its claim of misappropriation of a trade secret. N. Highland Inc. v. Jefferson Mach. & Tool Inc., No. 2015AP643, unpublished slip op., ¶¶11, 26 (Wis. Ct. App. Apr. 28, 2016).

¶2 North Highland contends that the court of appeals erred and that it is entitled to summary judgment in its favor. It alleges that Wells conspired to breach a fiduciary duty that Dwain Trewyn ("Trewyn"), a former North Highland employee, owed to the company. North Highland further contends that Wells misappropriated a trade secret in violation of Wis. Stat. § 134.90 (2013-14) (Uniform trade secrets act).[2]

¶3 In this review of a grant of summary judgment, we examine the conspiracy and misappropriation claims through the lens of sufficiency of evidence. We determine that North Highland has not met its burden to show that there exists a genuine issue of material fact as to either claim. Consequently, due to insufficiency of evidence, both of North

---

Because the court of appeals opinion is an unpublished per curium, it provides neither precedential nor persuasive value. Wis. Stat. (Rule) § 809.23(3)(b).

[2] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

Highland's claims fail to survive Well's summary judgment motion.[3]

¶4    Accordingly, we affirm the decision of the court of appeals affirming the circuit court's grant of summary judgment in favor of Frederick Wells.[4]

---

[3] In its petition for review, North Highland framed the issues as a question of whether it could maintain suit against Wells for any of the following:  (a) conspiracy with Trewyn to violate Trewyn's breach of fiduciary duties to North Highland, (b) aiding and abetting Trewyn's breach of fiduciary duties to North Highland, (c) interference with Trewyn's contractual or fiduciary obligations to North Highland, or (d) for interference with North Highland's prospective contract with another person. In its brief, it asserts that the circuit court incorrectly dismissed these claims on the basis of claim preclusion.

We observe, as did the court of appeals, that the evidentiary record in this case is incomplete.  North Highland asks this court to reverse the circuit court's decision dismissing its claims against Wells, yet the hearing transcripts setting forth the circuit court's oral ruling are not in the record before us.  Additionally, the only claim set forth above that North Highland has briefed or argued before this court is its conspiracy claim against Wells.  Without evidence or argument, we do not address the circuit court's grant of summary judgment on the aiding and abetting or interference claims.

[4] Although we affirm the court of appeals determination that North Highland's claim for misappropriation of a trade secret fails for lack of evidence, we do so with a different focus on the inquiry.  The court of appeals focused on whether there was sufficient evidence to demonstrate that a bid amount constitutes a trade secret.  See N. Highland Inc. v. Jefferson Mach. & Tool Inc., No. 2015AP643, ¶¶25 (Wis. Ct. App. Apr. 28, 2016) (determining that North Highland "fails to explain to this court why its bid amount constitutes 'information' as that term is used in Wis. Stat. § 134.90(1)(c).).

(continued)

I

¶5    This review originates from a lawsuit North Highland brought against Frederick Wells, Dwain Trewyn, Bay Plastics, Inc., and Jefferson Machine & Tool Inc. ("Jefferson Machine").

¶6    Wells is the owner of Bay Plastics, a distributer of customized plastic parts that it purchased from vendors. One of its vendors was North Highland, a small manufacturing company. Trewyn was an employee of North Highland with job duties that included submitting quotes and obtaining business for the company.[5]

¶7    When Wells decided that he wanted to form a company to manufacture the parts Bay Plastics sold, he asked Trewyn to be his partner in the new business. While Trewyn was still employed at North Highland, he and Wells formed their new

---

In contrast, the focus of our inquiry addresses whether there is sufficient evidence to show misappropriation. Because our determination that there is insufficient evidence to show misappropriation is dispositive, we need not further address the court of appeals' per curium disposition of this claim.

Likewise, because our determination that there is insufficient evidence to support a claim for conspiracy to breach a fiduciary duty is dispositive, we need not reach North Highland's argument that the circuit court erred in determining that its civil conspiracy claim is barred under the doctrine of claim preclusion.

[5] As set forth more fully below, Trewyn filed a Chapter 7 bankruptcy petition, which ultimately led to a settlement agreement dismissing North Highland's claims against Trewyn with prejudice. See infra ¶17.

manufacturing company, Jefferson Machine.[6]   Wells owned 75 percent of Jefferson Machine and Trewyn owned 25 percent.

¶8   The underlying dispute arose when both North Highland and Jefferson Machine submitted confidential bids on a manufacturing project for Tyson Foods Inc. ("Tyson").[7]   North Highland alleges that while Trewyn was still its employee, he formulated confidential bids for both North Highland and Jefferson Machine, the company he co-owned with Wells.

¶9   Jefferson Machine was awarded the Tyson project, but its contract was cancelled after North Highland threatened to seek an injunction, blocking the performance of the contract. Ultimately, neither Jefferson Machine nor North Highland was awarded the Tyson contract.

¶10 North Highland subsequently filed a lawsuit against Trewyn, Jefferson Machine, Wells, and Bay Plastics.   In its amended complaint, North Highland alleged that:   (1) the defendants misappropriated trade secrets; (2) Trewyn breached his fiduciary duties to North Highland and that the other defendants conspired with Trewyn in the breach of those duties; (3) Trewyn breached his contract with North Highland; and (4) the defendants interfered with Trewyn's contract with North Highland.

---

[6] Trewyn did not have a non-compete agreement with North Highland.

[7] The Tyson project was for the manufacture of 3,000 stainless steel trolley assemblies for use in food production.

¶11 The affidavits on file demonstrate that during litigation, both Wells and Trewyn repeatedly testified at their depositions that Wells had no knowledge that Trewyn was bidding on behalf of North Highland. For example, Wells testified:

Q: Did you know that [Trewyn] was doing bidding on behalf of North Highland to some customers——

A: No.

Q: ——from September to December of 2011?

A: No.

¶12 Wells also repeatedly testified that he had no knowledge that Trewyn was bidding specifically on the Tyson project for North Highland. For example, he testified:

Q: Did you know that [Trewyn] submitted a bid for trolleys to Tyson?

A: No, I did not.

Q: Did you know that [Trewyn] submitted any other bids to Tyson for trolleys?

A: Any other bids?

Q: On North Highland's behalf.

A: No.

¶13 Trewyn similarly testified that Wells had no knowledge Trewyn was bidding on the Tyson project for North Highland:

Q: And [Wells] knew about your work with Tyson, for example?

A: I didn't discuss Tyson stuff with him, no.

. . .

Q: Did you tell [Wells] that you had submitted the bid [for North Highland] in Exhibit 1?

A: No.

Q: Why not?

A: Because there was really no reason to discuss that with him.

. . .

Q: Is there any reason why you didn't mention your work on the trolleys at North Highland to [Wells]?

A: There was no reason to.

Q: You didn't think it was important?

A: No.

¶14 In addition, Wells repeatedly denied that he formed Jefferson Machine to compete against North Highland:

Q: Did you understand that Jefferson Machine & Tool was a competing business of North Highland?

A: No, no, not necessarily.

. . .

Q: But you knew when you started Jefferson Machine & Tool that it would be a competing business to North Highland?

A: I did not know that, no.[8]

¶15 Wells further testified that he left the bidding at Jefferson Machine up to Trewyn:

Q: When [Trewyn] was doing bids for you at Jefferson Machine & Tool, did you leave quoting entirely up to him?

A: Yes.

---

[8] As set forth above, Wells asserts that he formed Jefferson Machine in order to manufacture the parts that Bay Plastics sold. See supra ¶7.

Q: And you didn't have any oversight over his bidding, right?

A: No.

Q: Did you ever ask him about how he formulated bids?

A: No, I did not.

Q: So you just left quoting at Jefferson Machine & Tool up to [Trewyn]?

A: Yes.

¶16 The circuit court granted in part and denied in part the defendants' motion for summary judgment. Pursuant to the circuit court order, Bay Plastics was dismissed as a party from the lawsuit and the trade secret and contract claims were dismissed with prejudice. The breach of fiduciary duty and conspiracy to breach a fiduciary duty claims remained.

¶17 Two days before trial on the fiduciary duty claims, Trewyn filed a Chapter 7 bankruptcy petition. In response, North Highland filed an adversary claim against Trewyn arguing that its state law claims were non-dischargeable in bankruptcy. Ultimately, North Highland and Trewyn entered into a settlement agreement that dismissed North Highland's claims against Trewyn with prejudice. The settlement allowed North Highland to maintain its state law claims against Wells and Jefferson Machine.

¶18 Wells moved to dismiss the remaining claims against both him and Jefferson Machine, arguing that a litigant may not maintain a derivative conspiracy claim when it has settled and dismissed all claims against the actual tortfeasor. The circuit

court granted Wells' motion to dismiss. North Highland appealed the circuit court's decision, naming Wells as the only respondent.[9]

¶19 The court of appeals issued a per curium opinion affirming the circuit court order. It determined that the circuit court properly entered summary judgment in favor of Wells because North Highland failed to set forth any facts establishing there was a conspiracy. N. Highland, No. 2015AP643, unpublished slip op., ¶¶16-17. Likewise, it determined that North Highland did not meet its burden of establishing that the amount of its bid for the Tyson project constituted a trade secret. Id., ¶26.

II

¶20 In this case we are asked to review the court of appeals' decision affirming the circuit court's grant of summary judgment in favor of Wells. We review a decision granting summary judgment independently of the determinations rendered by the circuit court and the court of appeals. Lambrecht v. Estate of Kaczmarczyk, 2001 WI 25, ¶21, 241 Wis. 2d 804, 623 N.W.2d 751.

¶21 On review, we apply the same two-step analysis the circuit court applies pursuant to Wis. Stat. § 802.08(2). It provides that the "judgment sought shall be rendered if the

---

[9] Given that the claims against Jefferson Machine were dismissed and not raised on appeal, we are not reviewing any claims that may apply to Jefferson Machine.

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2). We examine the record in the light most favorable to the non-moving party. Lambrecht, 241 Wis. 2d 804, ¶3 (citation omitted).

¶22 "The mere allegation of a factual dispute will not defeat an otherwise properly supported motion for summary judgment." Helland v. Kurtis A. Froedert Mem'l Lutheran Hosp., 229 Wis. 2d 751, 756, 601 N.W.2d 318 (Ct. App. 1999). A party opposing a motion for summary judgment must demonstrate that there exists a genuine issue of material fact. Id. "It is not enough to rely upon unsubstantiated conclusory remarks, speculation, or testimony that is not based upon personal knowledge." Id. (citation omitted).[10]

---

[10] The reliance Chief Justice Roggensack's dissent places on Leske v. Leske, 197 Wis. 2d 92, 97-98, 539 N.W.2d 719 (Ct. App. 1995), is misguided. Leske is distinguishable from the facts of this case because the moving party apparently submitted no material in support of its motion beyond a statement that the plaintiff lacked evidence.

The dissent further misreads Leske, stating that "[if] a movant's submissions do not establish by undisputed facts that the nonmoving party has no claim or defense, the movant has failed to meet its burden. Roggensack, C.J., dissent, ¶94 (citing Leske, 197 Wis. 2d at 96-97). Quite the contrary, Leske instructs that "the moving party need not support its motion with affidavits that specifically negate the opponent's claim." 197 Wis. 2d at 97 (quotation and citations omitted).

¶23 Finally, a claim for conspiracy to breach a fiduciary duty requires a more stringent test than whether a reasonable inference may be drawn from the facts. Maleki v. Fine-Lando Clinic Chartered, S.C., 162 Wis. 2d 73, 84, 469 N.W.2d 629 (1991). To prove a conspiracy, a plaintiff "must show more than a mere suspicion or conjecture that there was a conspiracy or that there was evidence of the elements of a conspiracy." Id. In order to sustain a jury verdict of conspiracy, there "must be a quantum of evidence that the trial judge can conclude leads to a reasonable inference of conspiracy." Id. at 85. If circumstantial evidence supports equal inferences of lawful or unlawful action, then the conspiracy is not proven and the case should not be submitted to the jury. Id.

III

¶24 We address first North Highland's claim that Wells and Trewyn conspired to breach a fiduciary duty that Trewyn owed to North Highland.

¶25 Civil conspiracy involves "a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful." City of Milwaukee v. NL Indus., Inc., 2005 WI App 7, ¶25, 278 Wis. 2d 313, 691 N.W.2d 888 (citation omitted). A civil conspiracy claim has three elements: (1) the formation and operation of a conspiracy; (2) a wrongful act or acts done pursuant to the conspiracy; and (3) damage resulting

from the act or acts.  Onderdonk v. Lamb, 79 Wis. 2d 241, 247, 255 N.W.2d 507 (1977).[11]

¶26 North Highland, therefore, has the burden to "set forth specific evidentiary facts that are admissible in evidence showing that there is a genuine issue for trial" of such overt acts taken in furtherance of the conspiracy.  Buckett v. Jante, 2009 WI App 55, ¶29, 316 Wis. 2d 804, 767 N.W.2d 376 (citations omitted).  To survive summary judgment, "there must be facts that show some agreement, explicit or otherwise, between the alleged conspirators on the common end sought and some cooperation toward the attainment of that end."  Augustine v. Anti-Defamation League of B'Nai B'Rith, 75 Wis. 2d 207, 216, 249 N.W.2d 547 (1977).

¶27 Additionally, "[t]o prove a conspiracy, a plaintiff must show more than a mere suspicion or conjecture that there was a conspiracy or there was evidence of the elements of a conspiracy."  Maleki, 162 Wis. 2d at 84.  "[I]f circumstantial evidence supports equal inferences of lawful action and unlawful action, then the claim of conspiracy is not proven."  Allen &

---

[11] "[T]here is no such thing as a civil action for conspiracy."  Singer v. Singer, 245 Wis. 191, 195, 14 N.W.2d 43 (1944).  Instead, there is only an action for damages caused by acts pursuant to a conspiracy, but none for the conspiracy alone.  Id.  Thus, "[i]n a civil action for damages for an executed conspiracy, the gist of the action is the damages."  Id.  "It is only the existence of overt acts which is critical, in order that damages occur, not the actionability of overt acts themselves."  Radue v. Dill, 74 Wis. 2d 239, 244, 246 N.W.2d 507 (1976).

O'Hara, Inc. v. Barrett Wrecking, Inc., 898 F.2d 512, 516 (7th Cir. 1990) (applying Wisconsin law).

¶28 North Highland cannot sustain this burden because it points to no evidence that Wells was aware that Trewyn formulated both Jefferson Machine's and North Highland's bid on the Tyson project. If Wells was not aware that Trewyn had allegedly breached his fiduciary duty to North Highland, Wells could not take overt acts in furtherance of the conspiracy. See, e.g., Bruner v. Heritage Companies, 225 Wis. 2d 728, 736, 593 N.W.2d 814 (Ct. App. 1999) ("In short, a civil conspiracy entails two or more persons knowingly committing wrongful acts.").

¶29 However, North Highland contends that the evidence submitted to the circuit court on summary judgment is sufficient to allow a reasonable inference that Wells conspired with Trewyn. It asserts that the evidence demonstrates that there was a conspiracy because: (1) Wells and Trewyn combined to form Jefferson Machine and compete against North Highland; (2) Wells purchased the manufacturing space and equipment and materials necessary for the Tyson project; (3) Wells incorporated Jefferson Machine; and (4) Wells told Trewyn that he should bid on the Tyson project.

¶30 Based on this evidence of Wells and Trewyn's working relationship at Jefferson Machine, an inference may be drawn that Trewyn shared his knowledge of the Tyson bid with Wells. However, the unrebutted deposition testimony supports the opposite conclusion. There is no evidence of the formation and

13

operation of a conspiracy. In his deposition, Wells repeatedly denied that he formed Jefferson Machine to compete against North Highland:

> Q: Did you understand that Jefferson Machine & Tool was a competing business of North Highland?
>
> A: No, no, not necessarily.
>
> . . .
>
> Q: But you knew when you started Jefferson Machine & Tool that it would be a competing business to North Highland?
>
> A: I did not know that, no.

¶31 Wells also repeatedly testified that he had no knowledge that Trewyn was bidding specifically on the Tyson project for North Highland. For example, he testified:

> Q: Did you know that [Trewyn] submitted a bid for trolleys to Tyson?
>
> A: No, I did not.
>
> Q: Did you know that [Trewyn] submitted any other bids to Tyson for trolleys?
>
> A: Any other bids?
>
> Q: On North Highland's behalf.
>
> A: No.

¶32 As set forth more fully above, Trewyn similarly testified that Wells had no knowledge Trewyn was bidding on the Tyson project for North Highland. He stated that he did not discuss his work on the Tyson project with Wells and that he did not tell Wells that he submitted a bid for North Highland. When

asked "why not?," Trewyn responded that "there was really no reason to discuss it." See supra, ¶13.

¶33 Not only is the first element of a conspiracy not met, there is no evidence that Wells told Trewyn to bid on the Jefferson Machine project. Indeed, Wells testified to the contrary during his deposition:

Q: When [Trewyn] was doing bids for you at Jefferson Machine & Tool, did you leave quoting entirely up to him?

A: Yes.

Q: And you didn't have any oversight over his bidding, right?

A: No.

Q: Did you ever ask him about how he formulated bids?

A: No, I did not.

Q: So you just left quoting at Jefferson Machine & Tool up to [Trewyn]?

A: Yes.

¶34 Without any contradictory evidence in the record, North's Highland's allegation that Wells and Trewyn conspired to breach a fiduciary duty claim is speculative at best. However, speculation is insufficient to create a genuine issue of material fact on summary judgment. Helland, 229 Wis. 2d at 756. Additionally, on a claim for conspiracy, a reasonable inference must be supported by a quantum of the evidence. Maleki, 162 Wis. 2d at 85.

¶35 North Highland has produced no evidence that Wells and Trewyn entered into an agreement, explicit or otherwise, to

conspire to breach Trewyn's fiduciary duty to North Highland. There is no evidence that Wells knowingly intended to compete with North Highland for the Tyson project, let alone by improper means. North Highland makes arguments aplenty in support of its position, but arguments are not facts.

¶36 Accordingly, we determine that North Highland has failed to provide sufficient evidence to support its conspiracy to breach a fiduciary duty claim.

IV

¶37 For the same reasons that North Highland's conspiracy to breach a fiduciary duty claim fails, it also cannot succeed on its claim that Wells misappropriated a trade secret in violation of Wis. Stat. § 134.90.

¶38 According to North Highland, its confidential bid amount on the Tyson project constitutes "information" under Wis. Stat. § 134.90(1)(c)(1)-(2). Pursuant to Wis. Stat. § 134.90(1)(c), a trade secret is defined as a specific type of information:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:
>
> > 1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> >
> > 2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

16

¶39 The court of appeals observed that as the party seeking trade secret protection, North Highland has the burden of establishing that its bid amount for the Tyson project constitutes a trade secret. N. Highland Inc. v. Jefferson Mach. & Tool Inc., No. 2015AP643, unpublished slip op. (Wis. Ct. App. Apr. 28, 2016) (citing Wis. Elec. Power Co. v. Pub. Serv. Comm'n of Wis., 106 Wis. 2d 142, 146, 316 N.W.2d 120 (Ct. App. 1981), aff'd, 110 Wis. 2d 530, 329 N.W.2d 178 (1983)). However, we need not wade into the discussion addressing whether a bid amount constitutes a trade secret, and, if so, under what circumstances. Even if North Highland could present evidence that its bid amount constitutes "information" as that term is used in Wis. Stat. § 134.90(1)(c), it has not provided sufficient evidence demonstrating misappropriation.

¶40 Wisconsin Stat. § 134.90(2) provides that a person may not use or disclose a trade secret when it was acquired through improper means:

> Misappropriation. No person, including the state, may misappropriate or threaten to misappropriate a trade secret by doing any of the following:
>
> (a) Acquiring the trade secret of another by means which the person knows or has reason to know constitute improper means.
>
> (b) Disclosing or using without express or implied consent a trade secret of another if the person did any of the following:
>
>> 1. Used improper means to acquire knowledge of the trade secret.
>>
>> 2. At the time of disclosure or use, knew or had reason to know that he or she obtained

17

knowledge of the trade secret through any of the following means:

> a. Deriving it from or through a person who utilized improper means to acquire it.
>
> b. Acquiring it under circumstances giving rise to a duty to maintain its secrecy or limit its use.
>
> c. Deriving it from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.
>
> d. Acquiring it by accident or mistake.

¶41  It is apparently undisputed that Trewyn formulated the confidential bids for the Tyson project on behalf of both North Highland and Jefferson Machine.  However, the parties dispute whether Wells was aware that Trewyn had access to North Highland's confidential bid amount at the same time he was formulating Jefferson Machine's bid.  See Wis. Stat. § 134.90(2)(b)2.  According to North Highland, it is reasonable to infer from Trewyn's testimony that he told Wells he was bidding on the Tyson contract and that Wells aided Trewyn in breaching his fiduciary duty to North Highland.

¶42  Contrary to North Highland's assertions, the evidence in the record fails to establish that Wells had knowledge of, let alone "acquired," "disclosed," or "used" the bid amount.[12]

---

[12] Chief Justice Roggesack's dissent maintains that the circuit court improperly granted summary judgment because Wells "failed to make a prima facie showing of sufficient undisputed, material facts . . . ."  Roggensack, C.J., dissent, ¶48.

(continued)

18

Indeed, North Highland has not alleged in its amended complaint that Wells personally acquired, disclosed or used North Highland's bid amount in any way. There are simply no facts or reasonable inferences derived from the facts to support such an allegation.

---

Rather than offering disputed facts, however, the dissent creates its own facts that are unsupported by the evidentiary record.

For example, the dissent asserts that Wells "knew that the company he and Trewyn owned were making use of North Highland's bid information, but he thought North Highland had no right to object to this." Id., ¶109. To the contrary, Wells denied any knowledge of North Highland's bid information:

Q: This is Exhibit 3. It is a quote from Dwain Trewyn on North Highland's behalf to Tyson for trolleys, right?

A: Yes.

. . .

Q: And you didn't know about either Exhibit 1 or Exhibit 3?

A: Yes, I did not know about these.

Q: And just like for Exhibit 1, you didn't think to ask?

A: No, I did not ask.

Again, the dissent tells the reader only part of the story, leaving the reader not merely ill-informed, but misinformed. Resting its analysis and conclusion on only a cherry-picked portion of the testimony about whether Trewyn had a non-compete agreement with North Highland, together with unsupported inferences, the dissent asserts that "Wells knew that the company he and Trewyn owned were making use of North Highland's bid information." C.J. Roggensack, Dissent, ¶109.

¶43 As set forth above, both Wells and Trewyn repeatedly testified that Wells had no knowledge that Trewyn was also bidding on behalf of North Highland. There is also no evidence in the record that Trewyn disclosed the bid amount to Wells. Given the unrebutted testimony that Wells was unaware that Trewyn formulated North Highland's bid on the Tyson project, we determine that North Highland has failed to meet its burden of providing sufficient evidence of misappropriation.

V

¶44 In sum, we determine that North Highland has not met its burden to show that there exists a genuine issue of material fact as to whether Wells and Trewyn conspired to breach a fiduciary duty. The evidence of record is insufficient to support a conspiracy claim.

¶45 We likewise conclude that North Highland has not met its burden of demonstrating that there exists a genuine issue of material fact regarding its claim that Wells misappropriated a trade secret. Again, the evidence of record fails to support such a claim. Consequently, both of North Highland's claims fail to survive Well's summary judgment motion.

¶46 Accordingly, we affirm the decision of the court of appeals affirming the circuit court's grant of summary judgment in favor of Frederick Wells.

*By the Court.*—The decision of the court of appeals is affirmed.

¶47 PATIENCE DRAKE ROGGENSACK, C.J. *(dissenting)*. The review before us arises from summary judgment. I conclude that defendants,[1] as the moving party to whom summary judgment was granted, failed to make a prima facie showing of sufficient undisputed, material facts that North Highland Inc.'s bid to construct and supply Tyson Foods, Inc. with 3,000 trolleys, (the Trolley Contract) did not meet the definition of a trade secret as set out in Wis. Stat. § 134.90(1)(c), which Fredrick A. Wells (Wells) and Jefferson Machine & Tool, Inc. (Jefferson Machine) misappropriated. <u>Leske v. Leske</u>, 197 Wis. 2d 92, 96-97, 539 N.W.2d 719 (1995).

¶48 Defendants also failed to make a prima facie showing of sufficient undisputed, material facts that Wells, Jefferson Machine and Dwain D. Trewyn (Trewyn) did not obtain or use North Highland's Trolley Contract bid information contrary to Wis. Stat. § 134.90(2). <u>Id.</u> Accordingly, I conclude that summary judgement was improperly granted dismissing North Highland's claim for trade secret misappropriation against Wells and Jefferson Machine.

¶49 And finally, I conclude that claim preclusion cannot be applied against North Highland based on the Stipulation and Order that dismissed Trewyn from this lawsuit. Therefore, I would reverse the decision of the court of appeals and remand

---

[1] Initially Dwain D. Trewyn, Frederick A. Wells and Jefferson Machine & Tool, Inc. were defendants. On this review, only Wells and Jefferson Machine remain.

1

for a jury trial of North Highland's claim against Wells and Jefferson Machine for misappropriation of a trade secret.[2]

## I. BACKGROUND

### 1. Parties

¶50 The Trolley Contract to fabricate and deliver 3,000 stainless steel twin trolley assemblies for Tyson's Council Bluff, Iowa facility is central to this dispute.

¶51 Trewyn worked for North Highland as a salesman until the end of December 2011. As part of his job, he bid, sometimes referred to as "quoted," on potential contracts for work that North Highland hoped to obtain.

¶52 Trewyn agreed to be subject to the confidentiality restrictions contained in North Highland's Associate Handbook. It provided in relevant part:

> [D]o not discuss confidential business with anyone who does not work for North Highland Inc. Such confidential information includes, but is not limited to . . . pending projects and proposals, pricing or costing information . . . . Anyone who discloses trade secrets or confidential business information will be subject to disciplinary action, up to and including termination of employment and legal action, even if he/she does not actually benefit from the disclosed information.[3]

---

[2] Although I do not address North Highland's breach of fiduciary duty claim, a reversal by this court would abrogate the court of appeals' decision in full. Blum v. 1st Auto & Cas. Ins. Co., 2010 WI 78, ¶46, 326 Wis. 2d 729, 786 N.W.2d 78 ("Unless this court explicitly states otherwise, a court of appeals opinion overruled by this court no longer retain[s] any precedential value."). Therefore, all North Highland's claims against Wells would be available for trial upon remand. Id.

[3] R. at 187:6.

¶53 In September of 2011, Wells incorporated Jefferson Machine. Trewyn and Wells were the sole shareholders, with Wells owning 75% and Trewyn owning 25%. Wells and Trewyn also were the sole employees of Jefferson Machine.

¶54 This lawsuit arose out of actions of Trewyn, while he was employed by North Highland, and of Wells, who knew that Trewyn was a salesman for North Highland at the time Trewyn and Wells prepared the Trolley Contract bid for Jefferson Machine that competed with North Highland's bid. A lengthy deposition was taken of Wells by an attorney for North Highland. The quotes below are from that deposition, Record 47, unless indicated otherwise.[4]

### 2. Bidding process

¶55 On November 11, 2011, Tyson sent a RFQ (request for quotes) on the Trolley Contract to a number of businesses. North Highland was on the RFQ list. Jefferson Machine was not.[5] Bids ("quotes") were not accepted by Tyson Foods unless the bidder was on Tyson's list of authorized bidders.

¶56 However, on December 1, 2011, Trewyn faxed Jefferson Machine's bid on the Trolley Contract to Tyson. On the cover sheet of the bid Trewyn said, "I received permission to quote

---

[4] Affidavit of Vincent J. Scipior, made in Support of Defendants Frederick A. Wells, Bay Plastics Inc., and Jefferson Machine & Tool Inc.'s Motion for Summary Judgment. Vincent Scipior is an attorney for the defendants.

[5] R. at 76:4.

the trolley assy's from Ray R. I hope that is not a problem."[6] Wells was aware of this. At his deposition, Wells testified:

Q    And Dwain was the one who got the opportunity for Jefferson Machine & Tool to bid on the trolley contract?

A    Yes.[7]

¶57  Trewyn and Wells[8] developed Jefferson Machine's bid on the Trolley Contract. Wells testified:

Q    That's Exhibit 5. That is Dwain's quote on Jefferson Machine & Tool's behalf for the trolleys.

A    Okay.

Q    Do you remember that?

A    Yes, Dwain put this together.

Q    And Dwain told you about it?

A    Yes.[9]

¶58  It is undisputed that Trewyn was an employee of North Highland when he and Wells submitted Jefferson Machine's bid.[10] Wells knew that Trewyn was employed at North Highland at that time. He testified:

---

[6] R. at 65:6.

[7] R. at 47:15-16.

[8] Wells had a sample trolley made at Tyson's request, and he purchased the equipment necessary to perform the Trolley Contract.

[9] R. at 47:20.

[10] Jefferson Machine's bid, R. at 65:7.

4

Q    Do you remember when you got the trolley contract?

A    I don't recall the date.

Q    It was in December of 2011, right?

A    I believe so.

Q    Do you know when Dwain quit his job at North Highland?

A    In December, end of December.

Q    The end of December?

A    Yes.

Q    After Jefferson Machine & Tool got the trolley contract?

A    Yes.[11]

¶59 Wells also acknowledged that he knew that Jefferson Machine was a competing business of North Highland. He testified:

Q    So Jefferson Machine & Tool was a competing business of North Highland?

A    It's the American way. You can compete. There's competitors all up and down the highway here for machine houses, injection molders, vacuum formers, fabricators. Look in the phone book.

Q    So you'd like to change your answer, yes, they are competing businesses?

A    They could be.[12]

¶60 However, we can infer from Wells' testimony that he believed he and Trewyn could use North Highland's bid

---

[11] R. at 47:11.

[12] R. at 47:9.

information because Trewyn did not have a non-compete agreement with North Highland. He testified:

Q    Did you think that North Highland had any right to have its employees not compete with them at the same time as they were employed at North Highland?

A    Say that again.

Q    Did you think that North Highland had any right to have its employees not compete against them while they were still employed at North Highland?

A    There was no non-compete form with them.

. . . .

Q    And the reason why you think they don't have that right is because they didn't have an express non-compete clause in their employment contract?

A    Yes.[13]

¶61  Wells was actively involved in bidding on the Trolley Contract. He testified:

Q    This is Exhibit 2. I'm going to show you email 6. That is an email from Gordon Slothower to you and Dwain, right?

A    Yes.

Q    And the email right on the top, it starts, "Attached is the revised," do you see where I'm pointing to?

A    Yes.

Q    Why was he giving you a revised trolley drawing?

A    I don't know. He copied me on whatever he sent to Dwain.

---

[13] R. at 47:12.

. . . .

Q    Well, when you're putting together the quote, the number, how much you would bid on the trolley contract, how would you formulate the number?

A    By the quotes on the raw material and the machining time and the assembly time to put the part together.

. . . .

Q    For the trolley contract at Jefferson Machine & Tool, were you aware that Tyson asked for samples of the trolleys to be created?

A    Yes.[14]

¶62 Jefferson Machine underbid North Highland and was awarded the Trolley Contract. This lawsuit followed. North Highland claimed for misappropriation of trade secrets, alleging that Trewyn took its Trolley Contract bid and Wells, who had reason to know that it was improper for Trewyn to disclose and use North Highland's bid, aided and abetted Trewyn and Jefferson Machine in the misappropriation of North Highland's trade secret. A jury trial was demanded in the complaint.

¶63 The circuit court granted summary judgment to defendants, dismissing the complaint. The court of appeals affirmed, based on its conclusion that North Highland had not proved that a bid was the type of information set forth in Wis. Stat. § 134.90(1)(c). North Highland Inc. v. Jefferson Mach. & Tool Inc., No. 2015AP643, unpublished slip op. (Wis. Ct. App. April 28, 2016). The court of appeals opined, "As the party seeking trade secret protection, it is North Highland's burden

---

[14] R. at 47:19-27.

7

to establish that the amount of its bid for the Tyson project constitutes a trade secret." Id., ¶26 (citing Wisconsin Elec. Power Co. v. PSC, 106 Wis. 2d 142, 146, 316 N.W.2d 120 (1981), which interpreted Wis. Stat. § 943.205(2)(1975) and not § 134.90).

## II. DISCUSSION

### A. Standard of Review

¶64 Whether a bid is a trade secret because it is a compilation of costs, labor and profit that has independent economic value from not being generally known to or readily ascertainable by proper means by competitors, and for which reasonable efforts to maintain its secrecy were taken, presents questions of fact. Minuteman, Inc. v. Alexander, 147 Wis. 2d 842, 849, 434 N.W.2d 773 (1989).

¶65 Wisconsin Stat. § 134.90 is Wisconsin's enactment of the Uniform Trade Secrets Act. Id. at 851. Sub section (7) provides:

> UNIFORMITY OF APPLICATION AND CONSTRUCTION. This section shall be applied and construed to make uniform the law relating to misappropriation of trade secrets among states enacting substantially identical laws.

We have recognized and followed the statutory directive for Wisconsin's enactments of uniform laws in other decisions. For example in Estate of Matteson, we said,

> The purpose of uniform laws is to establish both uniformity of statutory law and uniformity of case law construing the statutes, ensuring certainty and guidance to litigants who rely on courts to interpret uniform statutes in a predictable and consistent manner.

8

Estate of Matteson v. Matteson, 2008 WI 48, ¶42, 309 Wis. 2d 311, 749 N.W.2d 557.

¶66 It is the majority view of those courts that have considered the standard of review that whether a trade secret exists is a question of fact. See, e.g., All West Pet Supply v. Hill's Pet Products, 840 F. Supp. 1433, 1437-38 (D. Kan. 1993); Network Telecommunications, Inc. v. Boor-Crepeau, 790 P.2d 901, 902 (Colo. App. 1990); Defiance Button Mach. Co. v. C&C Metal Products Corp., 759 F.2d 1053, 1063 (2d Cir. 1985).

¶67 In order to provide the benefits of the Uniform Trade Secrets Act to Wisconsin litigants, Wisconsin courts should employ the majority interpretation for the standard of review accorded to trade secret claims. Accordingly, I conclude that whether a trade secret exists under Wis. Stat. § 134.90 is a question of fact to be determined by the trier of fact.

¶68 We independently review whether North Highland's complaint was properly dismissed on summary judgment. Burbank Grease Services, LLC v. Sokolowski, 2006 WI 103, ¶6, 294 Wis. 2d 274, 717 N.W.2d 781. In order to affirm summary judgment dismissing North Highland's trade secret claim, we would be required to conclude that the defendants made a prima facie showing of sufficient, undisputed material facts that North Highland's bid for the Trolley Contract was not a trade secret, which Wells, Jefferson Machine and Trewyn did not misappropriate. Leske, 197 Wis. 2d at 97-98. "A statement that the plaintiff lacks evidence is insufficient" to meet the moving party's burden at summary judgment. Id. at 97.

9

¶69 Here, the interpretation of Wis. Stat. § 134.90 is intertwined with summary judgment. The interpretation and application of a statute present questions of law that we review independent of the decisions of the court of appeals and circuit court, but benefitting from their discussions. State v. Duchow, 2008 WI 57, ¶11, 310 Wis. 2d 1, 749 N.W.2d 913 (citing Marder v. Bd. of Regents of the Univ. of Wis. Sys., 2005 WI 159, ¶19, 286 Wis. 2d 252, 706 N.W.2d 110).

¶70 And finally, whether claim preclusion was correctly applied by the circuit court is a question of law for our independent review. Lindas v. Cady, 183 Wis. 2d 547, 552, 515 N.W. 458 (1994).

## B. Trade Secret

### 1. General principles

¶71 Trade secret law in Wisconsin is established by Wis. Stat. § 134.90. Section 134.90 made significant changes in trade secret law from that which was formerly set out in Wis. Stat. § 943.205(2) (1975). For example, Wisconsin courts interpreted § 943.205(2) (1975) by following Restatement (First) Torts § 757, cmt. b (1939). See, e.g., Abbott Laboratories v. Norse Chemical Corp., 33 Wis. 2d 445, 147 N.W.2d 527 (1967) and Gary Van Zeeland Talent, Inc. v. Sandas, 84 Wis. 2d 202, 267 N.W.2d 242 (1978).

¶72 The Restatement (First) of Torts § 757, cmt. b (1939) engrafted a "continuous use requirement" onto the statutory definition of trade secret, as did Wisconsin's appellate courts. For example, Wisconsin Elec. Power Co., 106 Wis. 2d at 147-48,

10

directed that in order to find protection under Wisconsin's trade secret law a party must show that the information does not relate "to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract," but rather the information must be "continually used in the operation of the business." Id. at 147-48 (quoting Restatement of Torts (First) § 757, cmt. b (1939)).

¶73  In Corroon v. Hosch, 109 Wis. 2d 290, 295, 325 N.W.2d 883 (1982), we affirmed that Wisconsin's former trade secret statute, Wis. Stat. § 943.205(2) (1975), incorporated the definition of Restatement (First) Torts § 757, cmt. b (1939). Many other states did the same before the Uniform Trade Secret Act was promulgated by the Uniform Law Commission. See Richard F. Dole, Jr., The Contours of American Trade Secret Law:  What Is and What Isn't Protectable as a Trade Secret, 19 (SMU Sci. & Tech. L. Rev. 89) (2016).

¶74  However, the continuous use doctrine no longer affects trade secret law in Wisconsin.  This is so because in 1986, Wisconsin enacted the Uniform Trade Secret Act.  Wis. Stat. § 134.90 (1986).  Section 134.90 created a new definition of trade secret that changed the Restatement's definition in part because § 134.90 eliminated the continuous use requirement from trade secret law.  Minuteman, 147 Wis. 2d at 852-53 (citing Uniform Trade Secrets Act, sec. I, comment, 14 U.L.A. 543 (1985)).

11

¶75 In Minuteman, we carefully examined the Uniform Trade Secret Act as set out in Wis. Stat. § 134.90, and explained that by enacting § 134.90, Wisconsin "created a new definition of trade secret." Id. We addressed specific provisions of Wis. Stat. § 134.90 in order to emphasize that in addition to adopting a new definition of trade secret, legal principles that may have affected trade secret law in the past were no longer applicable in Wisconsin. We identified § 134.90(6) as we explained that trade secret law had been changed significantly. Subsection (6) provides:

> (6) Effect on other laws. . . . (a) Except as provided in par. (b), this section displaces conflicting tort law, restitutionary law and any other law of this state providing a civil remedy for misappropriation of a trade secret.

Id. at 852 (footnote omitted).

¶76 Because we had employed Restatement (First) of Torts' definition of trade secret in Corroon and Wis. Stat. § 134.90 changed the definition of trade secret, we directed that "[t]he test established in Corroon [] is [] no longer the legal standard" for determining what may qualify as a trade secret. Id. at 852. We explicitly provided that the definition of trade secret no longer has a continuous use requirement. Id. at 852-53.

## 2. Bid as a trade secret

¶77 We have not considered whether a bid may be found to be a trade secret since Wisconsin enacted the Uniform Trade Secrets Act. Other states that have enacted the Uniform Trade Secrets Act have litigated whether bids for prospective work

12

qualify as trade secrets. And, numerous courts have concluded that a confidential bid is a trade secret. USA Power, LLC v. PacifiCorp, 372 P.3d 629 (Utah 2016) is a recent example. In USA Power, a region served by the utility, PacifiCorp, was in need of additional power generation. USA Power was aware of the opportunity to design and construct an additional facility, and it spent two years and nearly $1 million studying, purchasing consultant's advice and formulating how and where to construct such a facility. Id. at 638.

¶78 USA Power disclosed its development plans to PacifiCorp under a confidentiality agreement when PacifiCorp was a potential purchaser of USA Power's development plan for the power generation facility. Id. After USA Power's disclosure, PacifiCorp terminated its negotiations to purchase USA Power's development plan and issued a Request for Proposal (RFP) for development of a power generation facility sufficient to serve the region's need. Id.

¶79 USA Power bid in response to the RFP, but PacifiCorp submitted its own competing bid. PacifiCorp's proposal was very similar to the bid for development of a power generation facility that USA Power had disclosed to PacifiCorp earlier. Id. When PacifiCorp selected its own bid, USA Power sued, claiming its bid was a trade secret created through its years of study, which PacifiCorp misappropriated. Id.

¶80 The jury agreed with USA Power. On motions after verdict, the court concluded that because PacifiCorp knew all the components of USA Power's development plan it could

13

anticipate its bid and make that bid a "price to beat." Id. at 654-55. As the court explained, "It can hardly be argued that, in a bidding contest, for one competitor to have access to another competitor's internal financial calculations—calculations that will certainly bear upon that competitor's ultimate bid—would have obvious value. Such financial information is a paradigmatic example of a trade secret." Id. at 655. In upholding the jury's finding that USA Power's bid was a trade secret, the court held "there was sufficient evidence in the record from which the jury could infer that a trade secret existed." Id.

¶81 In Ovation Plumbing, Inv. v. Furton, 33 P.3d 1221 (Colo. Ct. App. 2001), a jury found that a plumbing subcontractor's bid was a trade secret. Furton appealed claiming that a bid does not qualify as a trade secret. Id. at 1223. The appellate court relied on the definition of trade secret under the Colorado statute, Colorado's enactment of the Uniform Trade Secrets Act. Id.

¶82 The court began by pointing out that "[w]hat constitutes a trade secret is a question of fact." Id. at 1224. Therefore, it considered whether sufficient evidence had been presented to the jury from which it could have found that the bid was a trade secret. Id.

¶83 There was testimony, "both direct and circumstantial" that the bid had value to Ovation because it was not known by Ovation's competitors. Id. at 1225. Although it was not "clear from the record whether Furton copied Ovation's bid documents or

14

merely used information that he took from the documents[,] . . . it [was] clear from the record that Furton did not have permission to access [Ovation's bid documents]." Id. After so concluding, the court affirmed the jury's verdict. Id. at 1225-26.

¶84 In CDC Restoration & Const., LC v. Tradesmen Contractors, LLC, 369 P.3d 452 (Utah Ct. App. 2016), a concrete contractor sued Tradesmen, the employer of a former employee, Paul Carsey. It also sued Carsey, and Keith Allen, all for misappropriation of trade secret under Utah's enactment of the Uniform Trade Secrets Act. The suit claimed misappropriation of CDC Restoration's bid for a Kennecott project for repair and restoration work. Id. at 455.

¶85 CDC Restoration did business with Kennecott under a Preferred Provider Agreement (PPA), a confidential document that set forth CDC Restoration's rates for work, pricing information for hourly employees and hourly rates for use of various types of equipment. Id. Carsey had been a CDC Restoration foreman for a number of years. Id. He regularly delivered confidential information to Kennecott for CDC Restoration, but he never signed a confidentiality agreement. Id.

¶86 In mid-2005, Keith Allen, who was then a subcontractor at Kennecott, met with Carsey to discuss forming a company to do work at Kennecott. Later in 2005, while he was employed by CDC Restoration, Carsey and Allen became co-owners of a new company, Tradesmen. Id. At that time, Allen was a subcontractor for Kennecott who supervised CDC Restoration's work there. Id. As

15

part of Allen's work for Kennecott, he had access to CDC Restoration's pricing information for its ongoing projects at Kennecott. Id.

¶87 In late 2005, Kennecott opened a competitive bidding process on a project known as E-Bay. Id. Carsey and another CDC Restoration employee, Ralph Midgley, developed CDC Restoration's bid for E-Bay. Shortly before the bid was submitted to Kennecott, Carsey told Midgley to increase the bid price because more hours of labor were needed than had been calculated initially. Midgley did so. Id.

¶88 In the meantime, Carsey and Allen put together a bid on Kennecott's E-Bay project for Tradesmen, which they submitted after CDC Restoration submitted its bid. Id. at 456. Tradesmen underbid CDC Restoration and got the contract. Id.

¶89 CDC Restoration sued Tradesmen, Carsey and Allen, alleging "misappropriation of trade secrets for improper use of its labor and equipment rates and bid information." Id. The trial court granted summary judgment for the defendants on all claims. Id. The court of appeals concluded that the record contained "enough evidence to create a genuine issue of material fact to preclude summary judgment regarding CDC's claim for misappropriation of bid information." Id.

¶90 A jury trial was held, and CDC Restoration prevailed. Id. Again, review was sought. The court of appeals reasoned that misappropriation of trade secrets had two elements: a finding that the bid was a trade secret and a finding that the bid had been misappropriated. Id.

16

¶91 In order to satisfy the first element, the court held that there must have been proof from which the jury could have found: (1) the bid had independent economic value that was "attributable to the independent efforts of the one claiming to have conceived it," and was not readily ascertainable by others, id. at 457-58; and (2) reasonable efforts had been taken to maintain the bid's secrecy. Id. at 458. The court affirmed the jury's finding that the bid was a trade secret, as that term is defined in the Uniform Trade Secrets Act. Id. The court also affirmed the jury's finding that the bid had been misappropriated within the definitions in the Uniform Trade Secrets Act. Id. at 460.

¶92 In sum, each of these courts reasoned that whether a confidential bid is a trade secret is a question of fact. However, each court also concluded that sufficient evidence had been presented to prove that the confidential bid at issue was a trade secret under the Uniform Trade Secrets Act.

### 3. North Highland's claim

¶93 In this review of the court of appeals' decision that affirmed the dismissal of North Highland's claim, it is important to remember that we are at the summary judgment stage, not after a trial, because the analyses are very different at those two different stages.

¶94 Upon review of summary judgment, we begin by testing the legal sufficiency of the complaint. As we have explained, "Every decision on a motion for summary judgment begins with a review of the complaint to determine whether, on its face, it

states a claim for relief." Hoida, Inc. v. M & I Midstate Bank, 2006 WI 69, ¶16, 291 Wis. 2d 283, 717 N.W.2d 17 (citing Westphal v. Farmers Ins. Exch., 2003 WI App 170, ¶9, 266 Wis. 2d 569, 669 N.W.2d 166). "If it does, we examine the answer to see if issues of fact or law have been joined." Id. Next, we consider "the moving party's affidavits [or other submissions] to determine whether they establish a prima facie case for summary judgment." Id. If a movant's submissions do not establish by undisputed facts that the nonmoving party has no claim or defense, the movant has failed to meet its burden. Leske, 197 Wis. 2d at 96-97.

¶95 Therefore, when defendants move for summary judgment dismissing plaintiff's claims, the burden of proof is on the defendants to have proved sufficient undisputed, material facts in the submissions in support of their motion that establish a prima facie showing from which the circuit court is required to conclude that plaintiff's claims must be dismissed. Id. at 97-98.

¶96 Although the movant is not required to submit affidavits, the movant must make submissions sufficient to "demonstrate the absence of a genuine issue of material fact." Id. at 97. Stated otherwise, the movant has the burden to demonstrate a basis in the record that shows the plaintiff lacks evidence to support the claim made. Id. at 97-98. It is only after the movant has made a prima facie showing for dismissal of the nonmoving party's claim, that the burden shifts to the

18

nonmoving party to provide submissions opposing the submissions of the movant. Hoida, 291 Wis. 2d 283, ¶16.

¶97 Leske involved a claim of misappropriation of a "'program designed to establish a business to manufacture, distribute, and sell ice for commercial use in Dane County and the surrounding area,'" which Leske claimed was a trade secret that defendants misappropriated. Leske, 197 Wis. 2d at 95. Id. at 96. The issue presented on appeal was whether the circuit court properly granted summary judgment dismissing the trade secret misappropriation claim. Id. at 96.[15]

¶98 The court of appeals began by examining the complaint. The court concluded the complaint stated a claim for violation of Wis. Stat. § 134.90, Wisconsin's trade secret law, which the answer denied. Id. at 96. The court then examined the submissions by defendants in support of their motion for summary judgment. Id. at 96-97. The court explained that defendants' understanding of their burden as the movants for summary judgment was not correct because defendants asserted that "we should immediately review the plaintiff's material to determine whether he produced evidence in support of his claims." Id. at 97. In reversing the circuit court's grant of summary judgment to defendants, the court explained, "[t]he defendants must demonstrate that the claimed trade secrets do not meet the definition of trade secret." Id. at 98. Although the

---

[15] This is the same issue, at the same stage of the proceedings, as has been presented by North Highland in the case now before the court.

defendants did make submissions in support of their motion, those submissions were insufficient to make a prima facie showing that plaintiff's claimed trade secret did not meet the definition of a trade secret. Therefore, the court of appeals reversed the circuit court's grant of summary judgment. Id. at 99.

¶99 Given the required summary judgment methodology, I begin by examining the complaint.[16] North Highland asserted a claim for trade secret misappropriation.[17] In support of its claim, North Highland asserted that one of Trewyn's duties at North Highland was to formulate North Highland's bid for the Tyson Foods Trolley project.[18] North Highland alleged that Trewyn and Wells "aided and abetted each other" in illegal acts that damaged North Highland.[19] North Highland's bid on the Trolley project was secret.[20] Knowing the amount and/or the terms of North Highland's bid "would allow one to bid slightly below the known bid."[21] The bidding process on the Trolley project was secretive.[22]

---

[16] I refer to the complaint, even though there is an amended complaint in the record because the two documents do not differ in regard to the allegations relating to North Highland's trade secret claim.

[17] Complaint, see pp. 6-7.

[18] Complaint, ¶¶7-9.

[19] Complaint, ¶6.

[20] Complaint, ¶¶16, 17.

[21] Complaint, ¶18.

[22] Complaint, ¶19.

¶100 North Highland had a confidentiality policy that was expressly set out in its Associate Handbook.[23] Trewyn agreed to comply with the confidentiality policy of the Associate Handbook.[24] Trewyn disclosed North Highland's trade secrets to defendants.[25] That disclosure permitted defendants to bid slightly more favorable terms on the Trolley project and were thereby awarded the project.[26] The defendants had reason to know that Trewyn's disclosing North Highland's bid and their subsequent use of it to North Highland's disadvantage was improper.[27]

¶101 I conclude that the allegations in the complaint are sufficient to state a claim for trade secret misappropriation.

¶102 My review of the answer of Wells and Jefferson Machine shows they denied the allegations in the complaint, generally based on insufficient knowledge to admit or deny.[28] Therefore, the answer is sufficient to join issues of fact and law in regard to North Highland's claim for trade secret misappropriation.

---

[23] Complaint, ¶11.

[24] Complaint, ¶21.

[25] Complaint, ¶20.

[26] Complaint, ¶20.

[27] Complaint, ¶¶22, 23.

[28] Answer, ¶¶1-19. Although Trewyn is no longer a party, his Answer, too, was sufficient to join issues of law and fact.

21

¶103 I next review Wells and Jefferson Machine's submissions in support of their motion for summary judgment that requested dismissal of North Highland's trade secret misappropriation claim to determine if they established a prima facie defense. Id. at 98. Wells and Jefferson Machine submitted the affidavit of one of their attorneys, Vincent J. Scipior.[29] He attached copies of depositions of Fred Wells and Dwain Trewyn. He also attached North Highland's answers to Wells' and Jefferson Machine's First Set of Interrogatories and Request for Production, Tyson Foods' original specifications and drawings for the trolleys, and page 6 of North Highland's Associate Handbook.

¶104 The defendants' brief before us is based on the attachments to the Scipior affidavit. Defendants argue in their brief that North Highland's bid on the Trolley Contract was not a trade secret under Wisconsin law.[30] They assert that a bid is not similar to the types of information listed in Wis. Stat. § 134.90(1)(c). They also argue because the bid was not for continuous or repeated use, it cannot fall within the statutory definition of trade secret. They assert, "One of the fundamental tenets of trade secret law is that information relating to a single event in the conduct of business is not

---

[29] R. at 47.

[30] Resp. Br. 39-45.

protected," for which proposition they cite Wisconsin Elec. Power Co.[31]

¶105 Wisconsin Elec. Power was issued by the court of appeals in 1981; it interprets Wis. Stat. § 943.205(2) (1975). It was issued before Wisconsin adopted the Uniform Trade Secrets Act, Wis. Stat. § 134.90.

¶106 Furthermore, the continuous use requirement relied on in defendants' brief was specifically removed from Wisconsin's trade secret law by Minuteman, a 1989 decision grounded in Wisconsin's enactment of the Uniform Trade Secrets Act. Minuteman, 147 Wis. 2d at 852-53.

¶107 There is no citation to Minuteman in defendants' brief. Furthermore, and much more troubling, there is no citation to Minuteman in the majority opinion even though North Highland clearly makes a claim for misappropriation of trade secret.

¶108 Minuteman is our thorough explanation of the changes brought about by Wisconsin's enactment of the Uniform Trade Secrets Act. Instead of citing Minuteman, the defendants cite cases from other jurisdictions, many of which were issued by jurisdictions that had not enacted the Uniform Trade Secrets Act.[32]

¶109 Wells also argues that "North Highland has not presented sufficient evidence to support a trade secret

---

[31] Resp. Br. 42.

[32] Resp. Br. 43.

23

misappropriation claim against [him.]"[33]  Wells asserts that he did not "use" North Highland's bid information, so he could not have misappropriated it.[34]  Evidence of misappropriation of trade secret information does not have to be direct evidence.  Circumstantial evidence must also be considered in determining whether Wells has established a prima facie defense.  See Gagliano & Co. v. Openfirst, 2014 WI 65, ¶32, 355 Wis. 2d 258, 850 N.W.2d 845.  Here, Wells' own deposition testimony of record defeats his ability to establish a prima facie defense.  For example, Wells was actively involved in bidding on the Trolley Contract:

> Q    This is Exhibit 2.  I'm going to show you email 6.  That is an email from Gordon Slothower to you and Dwain, right?
>
> A    Yes.
>
> Q    And the email right on the top, it starts, "Attached is the revised," do you see where I'm pointing to?
>
> A    Yes.
>
> Q    Why was he giving you a revised trolley drawing?
>
> A    I don't know.  He copied me on whatever he sent to Dwain.[35]

Wells' involvement in the bidding is further demonstrated; for example, he testified:

---

[33] Resp. Br. 45.

[34] Resp. Br. 45-46.

[35] R. at 47:19.

Q    What did you know about the trolley contract in November of 2011?

A    We had an opportunity to quote on it.

Q    And you were in conversation with Tyson personnel about that quoting?

A    Yes.

Q    And in December of 2011 you were also still communicating with Tyson and with Dwain about the trolley contract?

A    Dwain was talking with Tyson on the trolley contract.

Q    And you were talking with Dwain?

A    About the trolley contract?

Q    Yes.

A    Yes.[36]

Furthermore, Wells knew that the company he and Trewyn owned were making use of North Highland's bid information, but he thought North Highland had no right to object to this. He explained:

Q    Did you think that North Highland had any right to have its employees not compete with them at the same time as they were employed at North Highland?

A    Say that again.

Q    Did you think that North Highland had any right to have its employees not compete against them while they were still employed at North Highland?

A    There was no non-compete form with them.

. . . .

---

[36] R. at 47:10-11.

Q    And the reason why you think they don't have that right is because they didn't have an express non-compete clause in their employment contract?

A    Yes.[37]

¶110 When considering the entirety of defendants' submissions, I conclude that they do not provide sufficient undisputed, material facts to preclude the bid from meeting the definition of a trade secret pursuant to Wis. Stat. § 134.90(1)(c) or to preclude the finding that Wells had "reason to know"[38] that he used North Highland's bid without the consent of North Highland after obtaining it through improper means, contrary to § 134.90(2).

¶111 My conclusion is required by Wis. Stat. § 134.90(1)(c), which provides:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:

1.    The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

2.    The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

---

[37] R. at 47:12.

[38] "Reason to know" is the Wis. Stat. § 134.90(2) standard that Wells' submissions must be sufficient to set aside in regard to misappropriation. As the quotes above show, he has not done so.

26

¶112 In order to satisfy Wis. Stat. § 134.90(1)(c)'s criteria and be found to be a trade secret, the bid: (1) must be information that is a compilation; (2) must derive independent economic value from not being generally known by competitors; (3) amount presented to Tyson must not be generally known or readily ascertainable by proper means; (4) must have been subject to reasonable efforts under the circumstances to protect its secrecy.

¶113 It is undisputed, as explained by Wells, that the bid is information assembled as a compilation[39] of "quotes on raw material and the machining time and the assembly time to put the part together."[40] And as Wells further acknowledged, the amount of a bid is not shared with others:

Q.   The only person you would disclose how much you were bidding was the customer?

A.   Correct.[41]

The reason for not sharing bid information is self-apparent: if competitors knew the amount of North Highland's bid, that amount becomes the "price to beat." USA Power, 373 P.3d at 654-55. However, whether North Highland took reasonable efforts under the circumstances to protect the bid's secrecy, is a question of fact. Minuteman, 147 Wis. 2d at 849.

---

[39] A compilation is an assemblage or gathering. Compilation, Roget's Thesaurus, 51 St. Martin's Press (1965).

[40] R. at 47:19.

[41] R. at 47:28.

27

¶114 The court of appeals assigned the burden of proof to North Highland in response to defendants' motion for summary judgment. North Highland, No. 2015AP643, ¶11 ("[W]e agree with Wells that summary judgment is appropriate because North Highland has failed to establish that there is sufficient evidence to support the claim."). While North Highland has the burden of proof at trial, it was error to assign the burden to North Highland on defendants' summary judgment motion when the defendants did not meet their obligation to make a prima facie showing that North Highland's bid did not meet the statutory definition of trade secret or that defendants did not have reason to know they obtained or used North Highland's bid information improperly. Leske, 197 Wis. 2d at 97-99 ("The defendants mistakenly assert that it is Thomas's burden to establish that he took reasonable precautions [to maintain secrecy]. While this would be true at trial, on summary judgment the moving defendants must establish that Thomas did not take reasonable steps.").

¶115 The court of appeals also erred when it relied on Wisconsin Elec. Power, which provides an interpretation of Wis. Stat. § 943.205(2) (1976). That statute no longer has any relevance to trade secret law. Minuteman, 147 Wis. 2d at 852-53.[42]

¶116 Furthermore, the court of appeals appeared not to recognize that the determination of whether a bid is a trade

---

[42] Minuteman v. Alexander, 147 Wis. 2d 842, 434 N.W.2d 773 (1989), is not addressed by the court of appeals.

secret as set out in Wis. Stat. § 134.90(1)(c) is a question of fact. Id. at 849, 854; Ovation, 33 P.3d at 1224; USA Power, 372 P.3d at 655. Similarly, if the jury determines that the bid is a trade secret, it also will be required to determine whether defendants misappropriated it. Minuteman, 147 Wis. 2d at 854-55. Both are factual findings under the Uniform Trade Secrets Act, and as we implied in Minuteman, they are factual findings under § 134.90(1).

### C. Claim Preclusion

¶117 The court of appeals chose not to address claim preclusion. North Highland, No. 2015AP643, ¶11. However, defendants continue to argue that North Highland's claim for misappropriation of trade secret is barred by claim preclusion because of the Stipulation and Order that dismissed Trewyn from this lawsuit. They assert that the circuit court correctly held that claim preclusion bars North Highland's claims.[43]

¶118 "Claim preclusion prevents relitigation of the same claim when: (1) there is an identity of parties or their privies in a prior lawsuit; (2) there is an identity of claims for relief that were brought, or should have been brought; and (3) a final judgment on the merits in a court of competent jurisdiction resolved the first lawsuit." Mrozek v. Intra Financial Corp., 2005 WI 73, ¶28, 281 Wis. 2d 448, 699 N.W.2d 54 (citing Kruckenberg v. Harvey, 2005 WI 43, ¶21, 279 Wis. 2d 520,

---

[43] Resp. Br. 17-26.

29

694 N.W.2d 879; <u>Northern States Power Co. v. Bugher</u>, 189 Wis. 2d 541, 551, 525 N.W.2d 723 (1995)).

¶119 Wells and Jefferson Machine create a bootstrap argument under which they assert that North Highland's misappropriation of trade secret claim is precluded. First, they contend that due to its Stipulation with Trewyn, North Highland cannot proceed on its conspiracy claim against them. They cite numerous cases on which I do not comment because I address only the misappropriation of trade secret claim. Then defendants bootstrap North Highland's trade secret claim as a "matter[] arising out of the same facts and occurrences," concluding that all claims against them are precluded.[44] Although the language "arising out of the same facts and occurrences" is claim preclusion language, Wells and Jefferson cannot meet the three necessary elements to support dismissal of all claims under claim preclusion.

¶120 First, neither Wells nor Jefferson Machine was a party to Trewyn's Stipulation, which was entered into during Trewyn's bankruptcy action. To the contrary, the Stipulation provides: "All rights are reserved by North Highland, Inc. to any claims made against joint or several tortfeasors, including Frederick Wells and Jefferson Machine & Tool Inc. North Highland, Inc.'s cause of action remains against all non settling tortfeasors."

¶121 Second, the defendants are not privies of Trewyn. As we have explained, "[p]rivity exists when a person is so

---

[44] Resp. Br. 23.

identified in interest with a party to former litigation that he or she represents precisely the same legal right in respect to the subject matter involved." Pasko v. City of Milwaukee, 2002 WI 33, ¶16, 252 Wis. 2d 1, 643 N.W.2d 72. The burden of proving the elements of claim preclusion is on the party asserting dismissal of claims based on claim preclusion. Id.

¶122 Although Trewyn was obligated to make certain payments to North Highland under the Stipulation, Wells and Jefferson Machine were not similarly obligated. For example, if Trewyn defaulted on the payments due under the Stipulation, the obligation for payment could not be enforced against Wells or Jefferson Machine. Wells and Jefferson are not privies of Trewyn.

¶123 Here, Trewyn, Wells and Jefferson Machine are alleged to be joint tortfeasors. North Highland sued each of them individually for misappropriation of trade secrets. The Stipulation and release entered with Trewyn is similar to releases that often are used when there is a settlement with one tortfeasor and the lawsuit continues against the remaining tortfeasors.[45]

¶124 Third, there was no final judgment on the merits of the trade secret action against Wells and Jefferson Machine at the time that the circuit court dismissed all claims against them based on claim preclusion. Accordingly, claim preclusion

---

[45] See, e.g., Pierringer v. Hoger, 21 Wis. 2d 182, 124 N.W.2d 106 (1963).

31

has no application to North Highland's trade secret misappropriation claim against Wells or Jefferson Machine.

### III. CONCLUSION

¶125 I conclude that defendants, as the moving party to whom summary judgment was granted, failed to make a prima facie showing of sufficient undisputed, material facts that North Highland's bid to construct and supply Tyson with 3,000 trolleys, did not meet the definition of a trade secret as set out in Wis. Stat. § 134.90(1)(c), which Wells and Jefferson Machine misappropriated. Leske, 197 Wis. 2d at 96-97.

¶126 Defendants also failed to make a prima facie showing of sufficient undisputed, material facts that Wells, Jefferson Machine and Trewyn did not obtain or use North Highland's Trolley Contract bid information contrary to Wis. Stat. § 134.90(2). Id. Accordingly, I conclude that summary judgment was improperly granted dismissing North Highland's claim for trade secret misappropriation against Wells and Jefferson Machine.

¶127 And finally, I conclude that claim preclusion cannot be applied against North Highland based on the Stipulation and Order that dismissed Trewyn from this lawsuit. Therefore, I would reverse the decision of the court of appeals and remand for a jury trial of North Highland's claim against Wells and Jefferson Machine for misappropriation of a trade secret.

¶128 REBECCA GRASSL BRADLEY, J. *(dissenting).* The circuit court's dismissal of North Highland, Inc.'s complaint against Frederick Wells reflects an improperly narrow conception of what constitutes a "trade secret" as well as a misapplication of the doctrine of claim preclusion.[1] Because I conclude that a confidential bid can be a trade secret and that an adversary action in Dwain Trewyn's federal bankruptcy proceedings does not necessarily preclude North Highland's claims against Wells in state court, I would reverse the decision of the court of appeals and therefore respectfully dissent. Additionally, I would remand to the circuit court for a jury trial; material

---

[1] Unfortunately, the court conducts its review of this case without the benefit of the circuit court's reasoning on the dispositive decisions. Although the record includes the circuit court's orders resolving the relevant motions for summary judgment and dismissal, those orders merely state the court's conclusions with a note that the orders were entered "[f]or the reasons stated on the record." But the transcripts of the relevant hearings are absent from the record on appeal.

The <u>appellant</u> has the initial responsibility to request transcripts for the record, Wis. Stat. § (Rule) 809.11(4)(a), and <u>any other party</u> also has the opportunity to request that transcripts be included in the record, Wis. Stat. § (Rule) 809.11(5). Appellate counsel for each party have a responsibility to identify all transcripts necessary for appellate review.

When the record on appeal lacks transcripts relevant to the circuit court's orders under review and the circuit court has not issued a written order explaining the reasons for its decision, appellate courts do not receive sufficient information to review the case in its entirety. Although I conduct my review in this opinion because the case raises questions of law and we do have the circuit court's conclusions, a future appellate court may not have sufficient information to proceed if appellate counsel fail to satisfy their responsibilities under the Wisconsin Rules of Appellate Procedure.

1

factual disputes remain on North Highland's trade secret misappropriation claim,[2] and the circuit court should restore its earlier ruling that North Highland's claims against Wells for civil conspiracy to breach a fiduciary duty, aiding and abetting breach of fiduciary duty, and interference with contract survive a motion for summary judgment.

I

A

¶129 Historically, Wisconsin has held that "[w]hether a trade secret exists is a mixed question of fact and law. Once the historical facts are found by the circuit court, whether those facts meet the legal standard is a question of law which we review without deference to the circuit court's decision." B.C. Ziegler & Co. v. Ehren, 141 Wis. 2d 19, 26, 414 N.W.2d 48 (Ct. App. 1987) (citation omitted) (citing Corroon & Black-Rutters & Roberts, Inc. v. Hosch, 109 Wis. 2d 290, 294, 325 N.W.2d 883 (1982)). Notwithstanding Wisconsin's adoption of a version of the Uniform Trade Secrets Act (UTSA), I would not cast this standard aside.

¶130 In Minuteman, Inc. v. Alexander, 147 Wis. 2d 842, 434 N.W.2d 773 (1989), this court properly acknowledged that when the legislature adopted the UTSA, it replaced the common law definition of "trade secret" with the statutory definition in

---

[2] Chief Justice Roggensack's dissent comprehensively sets forth facts from the record, which, viewed in the light most favorable to the party opposing summary judgment (here, North Highland), show genuine issues of material fact properly resolved at trial.

2

Wis. Stat § 134.90(1)(c).  <u>Minuteman</u>, 147 Wis. 2d at 851-52. Accordingly, the six-factor test from <u>Corroon & Black-Rutters & Roberts, Inc. v. Hosch</u>, 109 Wis. 2d 290, 325 N.W.2d 883 (1982), no longer set the standard for determining the existence of a trade secret, although the test continues to offer "helpful guidance in deciding whether certain materials are trade secrets" under the statute. <u>Minuteman</u>, 147 Wis. 2d at 851-53.

¶131 The <u>Minuteman</u> court, however, did not discuss whether the statutory abrogation of the common law definition of "trade secret" had a similar impact on the standard of review in trade secret cases.  Instead, the <u>Minuteman</u> court set forth a standard of review before discussing Wis. Stat. § 134.90:

> The construction of a statute or the application of a statute to a particular set of facts is a question of law. <u>Bucyrus-Erie Co. v. ILHR Dept.</u>, 90 Wis. 2d 408, 417, 280 N.W.2d 142 (1979).  This court decides questions of law without deference to the circuit court's determination. <u>Ball v. Dist. No. 4, Area Bd. of Vocational, Technical & Adult Education</u>, 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984).  This court, however, accepts the circuit court's findings of fact unless they are clearly erroneous.  Section 805.17(2), Stats.

<u>Minuteman</u>, 147 Wis. 2d at 853.  Although the <u>Minuteman</u> court did not specifically identify the "mixed" standard of review derived from <u>Corroon & Black</u>, its statement of separate standards for statutory interpretation, on the one hand, and circuit court findings of fact, on the other, suggests an implicit acknowledgement of the mixed nature of the questions raised in trade secret cases.

¶132 Among state and federal courts interpreting various enactments of the UTSA, the majority of jurisdictions

3

characterize the existence of a trade secret as a "question of fact." See, e.g., Learning Curve Toys, Inc. v. PlayWood Toys, Inc., 342 F.3d 714, 723 (7th Cir. 2003) ("The existence of a trade secret ordinarily is a question of fact."); Ovation Plumbing, Inc. v. Furton, 33 P.3d 1221, 1224 (Colo. App. 2001) ("What constitutes a trade secret is a question of fact."); see also 1 Melvin F. Jager, Trade Secrets Law § 5.2, at 5-4 (2016) ("In the view of the majority, the existence of a trade secret is considered to be a 'question of fact.'"). But the reasons for treating the existence of a trade secret as purely a question of fact are not clear. The Fifth Circuit has suggested that because "[t]he term 'trade secret' is one of the most elusive and difficult concepts in the law to define" the question therefore "is of the type normally resolved by a fact finder after full presentation of evidence from each side." Lear Siegler, Inc. v. Ark-Ell Springs, Inc., 569 F.2d 286, 288-89 (5th Cir. 1978). Other jurisdictions seem to repeat the standard with a quotation or citation but no analysis, and following those citations to the principle's source reveals nothing more than an ostensible truism——also devoid of analysis.[3]

---

[3] For example, working backward from Ovation Plumbing, Inc. v. Furton, 33 P.3d 1221, 1224 (Colo. App. 2001), the Colorado Court of Appeals successively cited the following cases for the principle that "[w]hat constitutes a trade secret is a question of fact": Gold Messenger, Inc. v. McGuay, 937 P.2d 907, 911 (Colo. App. 1997); Network Telecomms., Inc. v. Boor-Crepeau, 790 P.2d 901, 902 (Colo. App. 1990); Mulei v. Jet Courier Serv., Inc., 739 P.2d 889, 893 (Colo. App. 1987), rev'd on other grounds 771 P.2d 486 (Colo. 1989) (en banc); Porter Indus., Inc. v. Higgins, 680 P.2d 1339, 1341 (Colo. App. 1984); Telex Corp. v. Int'l Bus. Machines Corp., 510 F.2d 894, 928 (10th Cir. (continued)

¶133 Wisconsin's mixed standard of review in trade secret cases therefore represents the minority approach. 1 Jager, _supra_, § 5.2, at 5-6 to 5-7. Nevertheless, the legislature's 1986 adoption of the UTSA in no way necessitates rejection of our standard of review in the same way it required us to acknowledge the abrogation of the common law definition of "trade secret." Indeed, the existence of a statutory definition of "trade secret" suggests that Wisconsin should retain its more nuanced standard. As the Minuteman court recognized when it first interpreted Wis. Stat. § 134.90, the construction of a statute and its application to historical facts presents a question of law for appellate courts to review independently. Minuteman, 147 Wis. 2d at 853; see also World Wide Prosthetic Supply, Inc. v. Mikulsky, 2001 WI App 133, ¶10, 246 Wis. 2d 461, 631 N.W.2d 253 ("Resolution of this appeal requires interpretation of Wis. Stat. § 134.90(4), a question of law we review de novo."). Trade secret cases no doubt turn on subtle questions of fact, such as, "Did the information derive independent economic value from its nondisclosure? Was the information subject to reasonable efforts to maintain its secrecy?" But no less than any other statute, it is the court's

---

1975). The Tenth Circuit's opinion in Telex Corp. merely states that "what constitutes a trade secret . . . is a question of fact for the trial court." 510 F.2d at 928. In turn Telex Corp. refers to Kodekey Electronics, Inc. v. Mechanex Corp., 486 F.2d 449 (10th Cir. 1973), which offers no more justification for the standard than the fact that trade secrets are a "nebulous concept," id. at 453-55 & n.3, the same unsatisfying reasoning articulated in Lear Siegler, Inc. v. Ark-Ell Springs, Inc., 569 F.2d 286 (5th Cir. 1978).

5

responsibility to say what § 134.90 means——as the question raised by North Highland in this case illustrates.[4]

B

¶134 North Highland argues that the circuit court and court of appeals erred by failing to conclude that a confidential bid may satisfy the definition of "trade secret" in Wis. Stat. § 134.90. Because the plain language of § 134.90 supports North Highland's broad interpretation of "trade secret," I would reverse the decision of the court of appeals and remand for the circuit court to consider North Highland's trade secret misappropriation claim under the proper standard of law.

¶135 Assessment of Wis. Stat. § 134.90 begins with its text. State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶¶44-51, 271 Wis. 2d 633, 681 N.W.2d 110. Section 134.90(1) defines "trade secret" as follows:

> (c) "Trade secret" means information, including a formula, pattern, compilation, program, device,

---

[4] This court's fundamental responsibility to interpret a Wisconsin statute also means Wis. Stat. § 134.90(7) does not mandate the jettisoning of our uniquely descriptive phrasing of the standard of review. Subsection (7) dictates that Wis. Stat. § 134.90 "shall be applied and construed to make uniform the law relating to misappropriation of trade secrets among states enacting substantially identical laws." In articulating the standard of review, however, we do not "apply" or "construe" any of the statute's language. Instead, the standard of review implicates the perspective from which the court approaches the statute before even considering its text. Joining other jurisdictions in repeating by rote that "the existence of a trade secret is a question of fact" risks putting before the finder of fact matters of statutory interpretation——questions of law——properly reserved for the court.

method, technique or process to which all of the following apply:

    1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

    2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

North Highland's claim therefore turns on whether a confidential bid constitutes "information" within the meaning of this section. To answer that question, I consider the plain meaning of the word "information," as well as the effect, if any, of the "including" clause that follows it in paragraph (c).

¶136 Dictionary definitions of "information" suggest that the term encompasses a broad class of knowledge. See Information, The American Heritage Dictionary of the English Language 901 (5th ed. 2011) ("Knowledge or facts learned, especially about a certain subject or event."); Information, Webster's Third New International Dictionary 1160 (1986) ("knowledge of a particular event or situation"; "facts or figures ready for communication or use"). These definitions indicate that "information" consists of facts, figures, or general knowledge regarding a particular subject matter and capable of practical application or use. Given the breadth of the term's scope, a business might possess any number of pieces of "information" that it wishes to protect, and a confidential bid price certainly consists of a figure that a business develops and communicates for the practical purpose of securing a contract.

¶137 Despite the broad reach of the term "information," Wells points to the remainder of the definition of "trade secret": "information, <u>including</u> a formula, pattern, compilation, program, device, method, technique or process." Wis. Stat. § 134.90(1)(c) (emphasis added). Wells argues that <u>State v. Popenhagen</u>, 2008 WI 55, 309 Wis. 2d 601, 749 N.W.2d 611, and <u>Village of Hobart v. Oneida Tribe of Indians of Wisconsin</u>, 2007 WI App 180, 303 Wis. 2d 761, 736 N.W.2d 896, hold that when a list introduced by "including" follows a general term, the list limits the scope of the general term to items similar in nature to those listed. <u>Popenhagen</u>, 309 Wis. 2d 601, ¶¶46-48; <u>Oneida Tribe</u>, 303 Wis. 2d 761, ¶9. The <u>ejusdem generis</u> canon of statutory construction discussed in those cases, however, does not invert the plain meaning of the term "including" in Wis. Stat. § 134.90 because the canon "has traditionally required the broad catchall language to <u>follow</u> the list of specifics." Antonin Scalia & Bryan A. Garner, <u>Reading Law</u> 202 (2012). Rather, "[f]ollowing the general term with specifics . . . mak[es] doubly sure that the broad (and intended-to-be-broad) general term . . . include[s] the specifics," meaning the "including" phrase serves a "belt-and-suspenders function" in the statutory text. <u>Id.</u> at 204. This construction of "including" also comports with the canon that presumes the use of "including" does not create an exhaustive list but merely an exemplary one. <u>Id.</u> at 132-33. Accordingly, formulas, patterns, compilations, programs, devices, methods, techniques, and processes are not the only types of

8

"information" that may satisfy the definition of "trade secret" in Wis. Stat. § 134.90(1).

¶138 The plain language of Wis. Stat. § 134.90(1) also defeats Wells's argument that the definition of "trade secret" includes a "continuous use" requirement. Wisconsin courts defining "trade secret" at common law held that "[a] trade secret is a process or device which is continually used in the operation of the business and thereby differs from secret information which may refer only to an isolated transaction." Wis. Elec. Power Co. v. Pub. Serv. Comm'n, 106 Wis. 2d 142, 148, 316 N.W.2d 120 (Ct. App. 1981) (internal quotation mark omitted) (quoting Future Plastics, Inc. v. Ware Shoals Plastics, Inc., 340 F. Supp. 1376, 1383 (D.S.C. 1972)). The court of appeals even went so far as to observe that a trade secret "differs from other secret information in a business . . . in that it is not simply information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract." Id. (alteration in original) (quoting Restatement (First) of Torts § 757 cmt. b (1939)). As already noted, the 1986 adoption of the UTSA abrogated the more restrictive common law definition of "trade secret." Minuteman, 147 Wis. 2d at 851-52. Because the language in Wis. Stat. § 134.90(1) does not include a continuous use requirement in the definition of "trade secret," it should not be judicially imposed here.[5]

---

[5] Confirming this plain meaning, an explanatory note accompanying the enactment of Wis. Stat. § 134.90(1) quotes from

(continued)

¶139 Wisconsin Stat. § 134.90(7) also commands courts to apply and interpret § 134.90 in a manner that will "make uniform the law relating to misappropriation of trade secrets among states enacting substantially identical laws." Refusing to graft a renewed "continuous use" requirement onto the definition of "trade secret" aligns with other jurisdictions, which already protect some types of business information as trade secrets, even if used only for a short period of time——or just once, in the case of a confidential bid. See, e.g., Economy Roofing & Insulating Co. v. Zumaris, 538 N.W.2d 641, 646-47 (Iowa 1995) (holding that complaint alleging misappropriation of "bid information" and "bid estimates" properly stated claim because "information" included "such [business] matters as maintenance of data on customer lists and needs, source of supplies, confidential costs, price data and figures" (emphasis omitted) (quoting US West Commc'ns, Inc. v. Office of Consumer Advocate, 498 N.W.2d 711, 714 (Iowa 1993))); B & G Crane Serv., L.L.C. v. Duvic, 2005-1798, p. 7-8 (La. App. 1 Cir. 5/5/06), 935 So. 2d 164, 168-69 ("[W]hile under the employ of [plaintiff], [defendant] . . . wrongfully misappropriated [plaintiff's] confidential pricing and bid/quote information . . . , terminated his employment with [plaintiff] and

_____

a report by the national conference of commissioners on uniform state laws, which observed that the UTSA's recommended definition of "trade secret" "contains a reasonable departure from the Restatement of Torts (first) definition which required that a trade secret be 'continuously used in one's business.'" 1985 Wis. Act. 236, § 6 note.

immediately . . . began unlawfully using that information to compete with [plaintiff] in attempt to win bids."); USA Power, LLC v. PacifiCorp, 2016 UT 20, ¶69, 372 P.3d 629 ("It can hardly be argued that, in a bidding contest, for one competitor to have access to another competitor's internal financial calculations——calculations that will certainly bear upon that competitor's ultimate bid——would have obvious value. Such financial information is a paradigmatic example of a trade secret."); cf. Ovation Plumbing, 33 P.3d at 1224 ("declin[ing] to adopt a per se rule that a bid on a contract cannot be a trade secret as a matter of law").

¶140 Categorically excluding confidential bids from trade secret protection contradicts the legislature's decision to bring all "information" within the definition of "trade secret," provided the other statutory parameters are met:

> Almost any subject matter may be a trade secret, including a secret formula or process, computer software, digital databases, the passcode for a website, biotechnology, mechanical configurations, information relating to the finding and extraction of oil and gas, plans, layouts and design drawings, recipes, boat hull molds, customer lists, instructional materials, internal business practices, manufacturing cost data, sales histories and forecasts, materials and plans for advertising, marketing, and distribution, and membership and employee information. Even religious material is eligible for trade secret protection.

3 Louis Altman & Malla Pollack, Callmann on Unfair Competition, Trademarks and Monopolies § 14:14, at 160 (4th ed. 2016) (footnotes omitted). Applying "information" to a broad spectrum of facts, figures, and knowledge, does not, however, infinitely

11

expand the scope of trade secret protection. After all, any individual piece of "information" satisfies the definition of "trade secret" only if it also meets the independent economic value and secrecy requirements in Wis. Stat. § 134.90(1)(c)1 and 2.

¶141 In this case, the parties focused their arguments on the threshold question of whether a confidential bid can be "information." Because I conclude, as a matter of law, that a confidential bid certainly constitutes "information" within the meaning of Wis. Stat. § 134.90, I would reverse the decision granting summary judgment to Wells on North Highland's trade secret misappropriation claim, and I would remand the matter to the circuit court for a jury trial on the remaining factual issues, including whether North Highland took reasonable measures to maintain the bid's secrecy and whether Wells misappropriated North Highland's bid.

II

¶142 The circuit court also ruled that claim preclusion barred North Highland's claims against Wells. I disagree. Courts apply the doctrine of claim preclusion to prevent "vexatious, repetitious and needless claim[s]" between the same parties on the same causes of action when another court has previously entered a final judgment on the merits. See N. States Power Co. v. Bugher, 189 Wis. 2d 541, 550, 525 N.W.2d 723 (1995) (quoting Purter v. Heckler, 771 F.2d 682, 690 (3d Cir. 1985)). Claim preclusion promotes finality in litigation and prevents a party from repeatedly filing the same cause of action

12

against the same defendant where that lawsuit has already resulted in "a final judgment on the merits in a court of competent jurisdiction." Id. at 551. "Key objectives of the doctrine of claim preclusion are to promote judicial economy and to 'conserve the resources the parties would expend in repeated and needless litigation of issues that were, or that might have been resolved in a single prior action.'" Mrozek v. Intra Fin. Corp., 2005 WI 73, ¶28, 281 Wis. 2d 448, 699 N.W.2d 54 (quoting Hanlon v. Town of Milton, 2000 WI 61, ¶20, 235 Wis. 2d 597, 612 N.W.2d 44). "The question of whether claim preclusion applies under a given factual scenario is a question of law that this court reviews de novo." Wis. Pub. Serv. Corp. v. Arby Constr., Inc., 2012 WI 87, ¶30, 342 Wis. 2d 544, 818 N.W.2d 863 (quoting N. States Power Co., 189 Wis. 2d at 551).

¶143 The factual scenario presented here involves not only North Highland's state court claims against Trewyn, Jefferson Machine & Tool Inc., and Wells but also a separate adversary proceeding by North Highland against Trewyn in federal bankruptcy court challenging the dischargeability of Trewyn's debt to North Highland. Ultimately, North Highland settled the dischargeability issue in bankruptcy court on its merits. Shortly after the settlement in that adversary proceeding, North Highland and Trewyn entered a stipulation in the state court case dismissing Trewyn alone but reserving North Highland's claims against Wells. Pursuant to this stipulation, the circuit court dismissed Trewyn from the case, ordering that the "matter shall proceed as between all remaining parties." None of the

13

stipulations or orders dismissing Trewyn from the state or federal court proceedings affected claims against Wells; rather, those claims were expressly reserved. None of the stipulations or orders adjudicated the merits of North Highland's claims——against any party——for trade secret misappropriation, civil conspiracy to breach fiduciary duties, aiding and abetting breach of fiduciary duties, or interference with contractual obligations.

¶144 Claim preclusion applies where there is "(1) an identity between the parties or their privies in the prior and present suits; (2) an identity between the causes of action in the two suits; and, (3) a final judgment on the merits in a court of competent jurisdiction." Id., ¶35 (quoting N. States Power Co., 189 Wis. 2d at 551). The absence of any element renders the doctrine inapplicable. See N. States Power Co., 189 Wis. 2d at 551. Under the circumstances presented in this case, there is clearly no identity of parties or final judgment on the merits.

¶145 There is no identity of parties because Wells was not a party to the bankruptcy proceeding involving Trewyn, which precipitated the settlement between North Highland and Trewyn leading to the dismissal of Trewyn alone as a party in this case. It remains uncontroverted that Trewyn and Wells are not

14

privies.[6] Wisconsin has long held that claim preclusion is unavailable if the parties are not the same. See Bentson v. Brown, 191 Wis. 460, 461-62, 211 N.W. 132 (1926). Here, North Highland wishes to proceed against Wells, not Trewyn; absent privity between the two defendants, Trewyn's dismissal from the case presents no bar to North Highland proceeding against Wells, an entirely distinct party.

¶146 Furthermore, there is no final judgment on the merits. Instead, Trewyn and North Highland settled the issue of whether any debt Trewyn may owe North Highland was dischargeable in bankruptcy, and this settlement included North Highland's agreement not to maintain suit against Trewyn. The settlement agreement dismissing the adversary proceeding in bankruptcy court, which led to the stipulated dismissal of Trewyn in the state court proceedings, does not even come close to an "adjudication on the merits by a court of competent jurisdiction." As this court explained in Mrozek v. Intra Financial Corp., 2005 WI 73, 281 Wis. 2d 448, 699 N.W.2d 54, a bankruptcy judgment may be a "final judgment on the merits"

---

[6] A "privy" refers to "[a] person having a legal interest of privity in any action, matter, or property; a person who is in privity with another." Privy, Black's Law Dictionary 1394 (10th ed. 2014). Privity can arise from various relationships. Id. (listing six types of privity). "The term also appears in the context of litigation. In this sense, it includes someone who controls a lawsuit though not a party to it; someone whose interests are represented by a party to the lawsuit; and a successor in interest to anyone having a derivate claim." Id. There is no indication that Trewyn and Wells maintain any relationship of this sort relative to the present litigation.

15

sufficient to satisfy the third prong under the claim preclusion doctrine, but only when the subject of the pending lawsuit was a "core proceeding" resolved by the bankruptcy court. Id., ¶¶29-31.[7] Regardless of the core versus non-core distinction, the bankruptcy court involved here did not litigate the subject of North Highland's lawsuit against Wells. Nor does it appear from this record that the bankruptcy court litigated the subject of North Highland's trade secret case against Trewyn. There was no bankruptcy court judgment on the merits of the pending lawsuit or on the facts underlying North Highland's civil suit. Rather, Trewyn and North Highland reached a settlement agreement, entered into a covenant not to sue, and stipulated to the dismissal of North Highland's adversary bankruptcy claim and distinct state court claims against Trewyn. Like the entry of a guilty plea disposing of a criminal case, which this court held did not satisfy the "actually litigated" requirement for issue preclusion to apply,[8] the settlement agreement does not satisfy the "judgment on the merits" requirement of claim preclusion because the settlement effected compromise without a judgment on the merits.

---

[7] But see Matrix IV, Inc. v. American Nat'l Bank and Trust Co. of Chi., 649 F.3d 539, 549-52 (7th Cir. 2011) (noting a split of authority on the core versus non-core reasoning).

[8] See Mrozek v. Intra Fin. Corp., 2005 WI 73, ¶21, 281 Wis. 2d 448, 699 N.W.2d 54 (observing that the guilty plea "inquiry is not the same as a fully litigated trial between adversarial parties resulting in the fact-finder determining that the facts prove" the allegations).

16

¶147 Of course, litigation in bankruptcy courts can preclude claims in subsequently filed lawsuits. See, e.g., Matrix IV, Inc. v. American Nat'l Bank and Trust Co. of Chi., 649 F.3d 539, 542, 547-52 (7th Cir. 2011) (holding that claim preclusion barred plaintiff's subsequent RICO and common law fraud action against same defendants involved in bankruptcy case where plaintiff fully "litigated and lost the very same fraud claims"). But the settlement here was unlike the cases applying claim preclusion following bankruptcy litigation. Indeed, some courts adopt a unique approach for determining whether claim preclusion should bar an action when the previous claim occurred in a bankruptcy court. One court explained why:

> "Because a 'bankruptcy case' is fundamentally different from the typical civil action, however, comparison of a bankruptcy proceeding with another proceeding is not susceptible to the standard [claim preclusion] analysis." Rather, a court must "scrutinize the totality of the circumstances in each action and then determine whether the primary test of . . . essential similarity in the underlying events[] has been satisfied." Also, the court must "properly tailor[]" the claim preclusion doctrine to the "unique circumstances that arise when the previous litigation took place in the context of a bankruptcy case." Ultimately, "a claim should not be barred unless the factual underpinnings, theory of the case, and relief sought against the parties to the proceeding are so close to a claim actually litigated in the bankruptcy that it would be unreasonable not to have brought them both at the same time in the bankruptcy forum."

Haskell v. Goldman, Sachs & Co., 355 B.R. 438, 449 (Bankr. D. Del. 2006) (citations and quoted sources omitted; fourth alteration in original).

17

¶148 Here, the claims North Highland pursues against Wells were not "actually litigated" in the bankruptcy case——Wells was not even involved in the bankruptcy proceeding. Nor would it have been reasonable or possible for North Highland to litigate its claims against Wells within Trewyn's bankruptcy proceeding. North Highland's agreement to forgo its state court lawsuit against a bankruptcy debtor whose obligations were dischargeable does not bar it from pointing the finger at Trewyn to establish a conspiracy with Wells, even though Trewyn cannot be held legally liable should the jury find in North Highland's favor.

¶149 The absence of a judgment on the merits also defeats Wells's argument that dismissal of North Highland's underlying claims against Trewyn precludes North Highland from proving that Wells is liable under a "derivative" theory such as conspiracy or aiding and abetting. Although Wells cites several cases from other jurisdictions for the proposition that dismissal of a tortfeasor precludes further proceedings against other defendants on derivative liability theories, those cases featured actual resolution of the underlying cases on the merits, unlike the settlement at issue here.[9] Wisconsin has long

_____

[9] See Discon Inc. v. NYNEX Corp., 86 F. Supp. 2d 154, 165-66 (W.D.N.Y. 2000) (district court previously dismissed underlying alleged violation of Sherman Act); Barrios v. Paco Pharm. Servs., Inc., 816 F. Supp. 243, 252 (S.D.N.Y. 1993) (noting conspiracy claim precluded after considering and rejecting merits of claim against alleged co-conspirator); Richard B. LeVine, Inc. v. Higashi, 32 Cal. Rptr. 3d 244, 253-54 (Ct. App. 2005) (holding that derivative liability precluded "where plaintiff has already arbitrated or litigated against the direct tortfeasor and lost" (emphasis added)).

18

recognized a plaintiff's ability to settle a claim with one joint tortfeasor while continuing to pursue a claim against another. See Imark Indus., Inc. v. Arthur Young & Co., 148 Wis. 2d 605, 621-22, 436 N.W.2d 311 (1989) (citing Pierringer v. Hoger, 21 Wis. 2d 182, 124 N.W.2d 106 (1963); Loy v. Bunderson, 107 Wis. 2d 400, 320 N.W.2d 175 (1982)). Because Wisconsin law contemplates continued proceedings after a plaintiff settles with an alleged joint tortfeasor, Trewyn's dismissal does not preclude a full hearing on the merits of North Highland's conspiracy, aiding and abetting, and interference claims against Wells.[10]

¶150 Trewyn's settlement with North Highland as part of bankruptcy proceedings in federal court and the subsequent dismissal of North Highland's state-court claims against Trewyn

---

[10] North Highland also directs our attention to Muchow v. Goding, 198 Wis. 2d 609, 623, 544 N.W.2d 218 (Ct. App. 1995), to argue that a settlement does not give rise to claim preclusion. But the cited portion of Muchow discusses the doctrine of collateral estoppel, now known as issue preclusion. See Paige K.B. ex rel. Peterson v. Steven G.B., 226 Wis. 2d 210, 219, 594 N.W.2d 370 (1999). "Issue preclusion addresses the effect of a prior judgment on the ability to re-litigate an identical issue of law or fact in a subsequent action." Mrozek, 281 Wis. 2d 448, ¶17. The doctrine precludes subsequent litigation only on questions of fact or law actually litigated in previous proceedings. Id.

Since Wells has focused his argument for dismissal on a theory of claim preclusion, I will not discuss issue preclusion in great detail. I do note, however, that the doctrine likely would not bar North Highland's claim against Wells because the extent of Wells's alleged liability to North Highland was never actually litigated during the federal dischargeability proceedings or as part of Trewyn's stipulated dismissal from this state-court action.

19

do not extinguish North Highland's previously-filed lawsuit against Wells in state court. These circumstances satisfy neither the elements of claim preclusion nor the objectives underlying the doctrine. Holding that the settlement of North Highland's adversary claim in Trewyn's bankruptcy proceeding precludes North Highland's claim against Wells could unnecessarily relieve jointly responsible tortfeasors from their legal obligations based on a dismissed defendant's fortuitous bankruptcy filing.

### III

¶151 In sum, I conclude that a confidential bid can be a trade secret. I would reverse the court of appeals' determination otherwise and remand to the circuit court because the record contains material disputed issues of fact for a jury to resolve on whether Wells violated trade secret law. Further, the circuit court erred in concluding that North Highland's action against Wells was barred under claim preclusion based on the compromise reached between North Highland and Trewyn resolving the adversary claim North Highland asserted in Trewyn's bankruptcy proceeding, which ultimately led to the dismissal of Trewyn alone from the state court case. I would reverse the circuit court's dismissal of this case and remand for a jury trial on North Highland's conspiracy, aiding and abetting, and interference with contract claims against Wells because the circuit court previously determined that material issues of disputed facts exist with respect to those claims.

¶152 For these reasons, I respectfully dissent.

¶153 I am authorized to state that Justice DANIEL KELLY joins this dissent.